STOTT *v.* AVERY.

1. SPECIFIC PERFORMANCE—EXECUTED CONTRACT—EQUITY—REAL PROPERTY.

   The purchaser of a lot in a tract which the vendors represented to be subject to building restrictions may enforce the equitable obligation to sell the remaining property subject thereto.

2. SAME—STATUTE OF FRAUDS.

   An oral contract for the enforcement of building restrictions executed on one side may be enforced against the other parties in equity.

3. REAL PROPERTY—BUILDING RESTRICTIONS—SPECIFIC PERFORMANCE—INJUNCTION—LACHES.

   A general plan of building restrictions in a district where complainant purchased property, subsequently modified by the vendors in sales known to complainant, without objection from him, and changed in a public auction which complainant attended without protest, and at which he purchased a lot subject to the modified restrictions, will not be enforced in equity to the injury of innocent purchasers.

4. EQUITY—PLEADING—SPECIFIC PERFORMANCE—VARIANCE.

   In an action for the enforcement of a plan for building restrictions, the representations and agreement charged in the bill of complaint must be proved substantially as averred.

Appeal from Wayne; Mandell, J.   Submitted January 22, 1909.   (Docket No. 98.)   Decided May 26, 1909.

Bill by David Stott against George E. Avery and others to enjoin the violation of certain building restrictions. From a decree dismissing the bill, complainant appeals. Affirmed.

*Keena, Lightner & Oxtoby*, for complainant.

*Walker & Spalding* and *William H. Wetherbee*, for defendants.

BLAIR, C. J.   This suit was instituted for the purpose of enjoining the violation of certain building restrictions, or, in lieu thereof, to recover damages for such violation.

In 1890 the complainant contracted for a lot on Commonwealth avenue, south of Calumet avenue, in the city of Detroit.   This lot was included in a tract of land platted by Newell Avery and Simon J. Murphy, to whose rights and obligations defendants have succeeded.   The tract of the plat affected by this suit is bounded on the south by Grand River avenue; on the west by Avery avenue; on the north by Calumet avenue; and on the east by Trumbull avenue.   Commonwealth avenue is immediately east of Avery avenue and immediately west of Trumbull avenue.

The bill avers that the owners of the tract in question, prior to its purchase—

"Entered upon a plan of dividing the said tract of land in such a manner, and of placing the same upon the market for sale upon such terms, and with such restrictions, as would insure to themselves and their grantees, and also to the several purchasers of lots in said tract of land, a first-class residence neighborhood."

That it appeared from the plat of the tract in question that the lots fronting on Trumbull, Avery, and Commonwealth avenues, "were of the depth of at least 130 feet, and had a frontage of at least 50 feet on either of said

avenues (except that a few of the corner lots had a frontage of not less than 45 feet)." That prior to the execution of his contract complainant—

" Was assured by said owners that the lots in said tract of land would be sold only upon the terms, and with the restrictions, which would insure the permanence of said property as a first-class residence neighborhood, and that said premises would be sold only in lots having a frontage of at least 50 feet (except the few corner lots as above stated). That nothing but residences would be permitted on said tract of land, and that no building should be placed within 20 feet of the lot on line of said Trumbull avenue, Commonwealth avenue, and Avery avenue, and that said 20-foot space should be left open for ornament only, and that no other than a single tenement, substantial brick dwelling, should be erected on a single lot, and that the value of any residence to be erected thereon should not be less than the sum of $3,000, and it was represented to your orator, and your orator considered it to be true, that the enforcement of said restrictions upon the said premises (meaning thereby the lots fronting on Trumbull, Commonwealth, or Avery avenues, and especially that portion lying south of Calumet avenue) would largely enhance the value of said lots, and that, on the ground of said restrictions, which were to be enforced as to all of said property, the owners thereof demanded a higher price for their property than it was admitted said property was reasonably worth, were it not for said restrictions."

That complainant's contract contained the following provision:

"ARTICLE 5. And said party of the second part also agrees to erect and complete within four years from the date hereof, a good and substantial dwelling house of brick on said premises, of the cost and value of at least $3,000 (three thousand dollars) and will not place the same or any other building within twenty (20) feet of Commonwealth avenue, in front of said premises, the object thereof being to secure the erection of a good class of dwellings, and of uniform distance from the avenue in front of the premises. And the said party of the second part further agrees that he will erect or cause to be erected only one single tenement dwelling house on the above-described lot."

That the consideration for said lot was largely in excess of the reasonable price of other property in that part of the city outside of said tract, and the owners knew that complainant entered into the contract, and agreed to pay such added price, solely in reliance upon the restrictions which he was assured had been enforced as to all property theretofore sold in said tract, and which would be enforced against the remaining lots not disposed of at that time by said owners.    Complainant further avers in his bill that about July 1, 1896, he exchanged this contract for a contract upon a corner lot on said Commonwealth avenue, upon substantially the same representations as were made in 1890, the contract for such purchase containing the same restrictions, except as to the value of the dwelling to be erected, which was stated as $8,000, instead of $3,000; ''that said provision in said contract was inserted in pursuance with said representations, and upon the understanding that substantially the same restrictions had been, and would in the future be, enforced against all of the property included in said tract;" that no sales of any lot fronting on Trumbull, Commonwealth, or Avery avenues in said tract southerly of Calumet avenue had been made previous to the date of said second contract, without requiring of the purchasers restrictions substantially as above set forth; " that at the time of the execution of said contract of July 1, 1896, and at the time of the construction of the residence thereon by your orator, no case had arisen of any violation of the terms of said building restrictions within the tract of land above set forth, and that your orator was therefore justified in relying upon the representations and assurances, given to him by the owners of said property as above set forth, that said restrictions would be maintained in the future as to all of said property."

Complainant further avers that in November, 1905, ''and with full knowledge of the restrictions which had, in justice and in equity, by the action and conduct and representations of said owners, and of the various persons

through whom they had derived title to said lots, become a part of said premises, or to which said lots had become liable, entered upon a plan" for disposing of, and did dispose of, a number of said lots at public auction sale, without requiring a compliance with said restrictions; "that quite a number of the lots in said tract of land have as yet not been conveyed by the said owners, but that, as your orator is informed and believes to be true, the said owners threaten and intend to sell and convey the remainder of said lots, without regard to the restrictions upon which the said lots had been held by them and those from whom they derived title, and without regard to the rights of your orator in the premises."

The bill prays for a temporary and permanent injunction, restraining the defendants—

"From selling or conveying any of the lots included in the premises above described, except with restrictions substantially the same as those contained in the contracts and deed to your orator, hereinbefore set forth, and also from constructing or completing upon said premises, or upon any lots contained therein, any buildings of any kind in violation of such restrictions; * * * that your orator, by the decree of this court, may be awarded against said defendants, or some one or more of them, such a sum, in addition to the relief hereinbefore prayed for, or in lieu thereof, as may adequately compensate your orator for the damages which he has heretofore or which he may hereafter suffer by reason of the violation of the undertakings, promises, and representations hereinbefore set forth."

The case was heard in open court, and at the conclusion of the proofs the circuit judge found against the complainant upon the grounds:

"By reason of the lapse of time complainant is unable to give the exact words of the vendors at the time of the sale, or to show whether the expressed intention of the vendors was the expression of a promise and contract undertaking, or was the expression of a hope and expectation. His testimony, taken in connection with that of the defendants on the subject, will not justify a finding

that there was a verbal contract, binding the owners not to dispose of other lots in the subdivision, except under the identical restrictions contained in complainant's contract and deed."

The court also found that he was not satisfied from the proofs that the loss in value which complainant's premises had suffered was due to the acts charged against defendants:

"It is a well-known fact that all of what is popularly known as 'inside residence property' has suffered a diminution in value in the past 10 years; and, in addition to this fact established by the proofs, we have in evidence the opinions of three well-known real estate experts, as against one expert, that complainant has not lost, but that rather he has reaped an advantage through the change in the restrictions. The proofs seem to me greatly to preponderate against complainant's theory of pecuniary loss through the alleged wrongful acts of the defendants."

A decree was entered dismissing the bill, and complainant appeals to this court.

Complainant testified in his own behalf that, in his negotiations with reference to the purchase of the lot in 1890, the plat of the property was before them, which showed the size of the lots to be, most of them, 50 feet, with the exception of one block, where they were 60 feet.

"It was principally Commonwealth avenue that I was considering.   *   *   *   That restriction applied to all the lots on Commonwealth avenue up to Calumet. There was no talk about Trumbull and Avery avenues."

And again:

"In my negotiations for my first contract it was represented that other, or the entire section up as far as Calumet avenue, restrictions of like character would apply to each lot, so far as Commonwealth avenue was concerned. I think Avery avenue was to be included in the building restrictions, but they might vary somewhat in value as to Avery avenue. This plat may have included Trumbull avenue, but nothing was said about Trumbull avenue in the discussion with me.   *   *   *   I asked them if those were the restrictions which they were going to impose on

that entire plat of property, and I was answered, 'Yes; as far as Calumet on Commonwealth and Avery, as far as Calumet.' * * * He was going to insist on the building restrictions, as they had been formerly outlined, being carried out.

"*Q.* And you were told in addition to that that they expected to continue selling on those restrictions?

"*A.* Yes, sir.

"*Q.* And that was substantially the way the thing was put to you?

"*A.* Yes, sir.

"*Q.* And that statement was never modified at any time?

"*A.* Not to me; no, sir, not until the time of the auction sale."

Being questioned by the court as to the exact words used by Mr. Murphy, complainant testified that he said:

"We intend to carry out these building restrictions. From his manner of speech, that he was going to insist upon those building restrictions being carried out on all those lots, I might not have considered the purchase of the lot under any other conditions. We will let other people out, but we will carry out yours."

The court having intimated that he thought the exact words, or the words that were used, would be important or almost vital, the complainant testified:

"The words, as I remember them: 'We are going to insist upon this section being built up.'

"*Q.* But as to the form of the words which were used regarding that matter, you don't profess to be positive as to which of the several different forms that you yourself employed in giving an account of the transaction was the exact one?

"*A.* I don't; no, sir. It would be impossible.

"*Q.* You have told us this morning that the restrictions which you have detailed, which were given you in 1890, you were told applied to Avery and Commonwealth, as far north as Calumet?

"*A.* Yes, sir.

"*Q.* And to those streets only, and did not apply to Trumbull avenue?

"*A.* I said no mention was made of Trumbull avenue.

"*Q.* Nothing was said to you about any restrictions on Trumbull?

"*A.* No, sir."

That he made no complaint as to the construction of houses on Trumbull and Avery avenues which violated the restrictions. That he gave no particular attention to Trumbull or to Avery, because he felt that, if the other neighbors were not injured, he did not think it was his place to interfere.

Defendant Murphy testified:

"For a number of years we had no restrictions upon the property in this subdivision at all. Then we made restrictions: $3,000 house; twenty feet from the street line; single tenement dwelling house, some of brick and some of wood. These restrictions were decided upon, I think, about 1890. We excluded at that time the part above Calumet avenue. * * * We began selling fractional parts of lots when Mr. Grindley became agent in 1894. We did that because we found we could not dispose of the property otherwise. * * * At the time this contract with Mr. Stott was made, I stated that we were restricting the other property, but I never agreed, by word or writing, that we would not modify these restrictions."

Defendant further testified that there were instances in which they were asked to bind themselves by written restrictions, which they refused to do.

At the time complainant entered into his contract in July, 1896, "the only completed houses on Commonwealth avenue were Mr. Charbonneau's and Mr. Guenther's. The Howard houses, I believe, were under construction." Mr. Guenther's house was built in 1890 or 1891, costing $8,000 or $9,000. Aside from the complainant's house and the four other houses mentioned, there were no other houses on Commonwealth avenue prior to the auction sale, which took place November 9, 1905. This auction sale was advertised in the Detroit News, Free Press, and Journal five consecutive days, commencing November 4, 1905, and there was also a large signboard, advertising the sale,

in view from Commonwealth avenue. The advertisement covered 7,000 feet of vacant property on Avery, Trumbull and Commonwealth avenues between Grand River and Putnam avenues north of Calumet, and represented that the property would be sold in 30, 40, and 50 foot lots. Complainant saw this advertisement several days before the sale, and attended at the auction, and purchased a lot on Commonwealth avenue adjoining his own, which he said he did to protect himself. The restrictions at this sale were stated by the auctioneer several times, and were as follows:

"No buildings shall be used for other than residence purposes. No buildings shall be placed nearer than 20 feet to the lot line on Avery, Commonwealth, and Trumbull avenues. On Avery avenue north of Alexandrine avenue nothing but a single dwelling house shall be erected on single lots. On Commonwealth avenue nothing but a single dwelling house or two-story apartment shall be erected on interior lots of 30 feet. No double dwelling house shall be erected on interior lots of less than 40 feet. No single dwelling house shall cost less than $2,800. No terrace shall cost less than $2,500 per apartment; no apartment house shall cost less than $1,750 per apartment. No apartment houses on Commonwealth avenue shall be more than three stories high."

Complainant objected to the owners to the sale proceeding in violation of the agreement as to restrictions, but took no steps to notify the prospective purchasers present of his rights. The sale lasted two or three hours. Complainant further testified that:

"At the auction sale all of the unsold lots in the plat, with the exception of a few in scattered portions of the plat, were sold, and at prices from $25 to $35 a foot."

He further testified:

" At the time of the sale I understood that sales were to be made on Commonwealth avenue in lots less than 50 feet front, and that apartment houses and terraces were to be allowed to be built, and that the cost of the apartments was to be somewhat less than $3,000. * * * I

hadn't heard anything in the matter of improvements. Particularly I hadn't heard whether or not the previous building restrictions would be enforced, but it was supposed that they would not be.

"*Q.* You supposed they would not be ?

"*A.* Would not be; yes, sir, from the fact they were selling it at auction. * * *

"*Q.* How long, as near as you can fix it, before the sale that you got the impression that the old building restrictions would not be enforced ?

"*A.* I could not answer that question.

"*Q.* It might have been a week ?

"*A.* It might have been a week.

"*Q.* You hadn't made any inquiry to verify the truth of that impression ?

"*A.* No, sir."

Complainant contends that, in view of the representations made by defendants or their predecessors in title, an equitable obligation arose binding them, in equity and good conscience, to insert the restrictions in all subsequent deeds made by them, and that such obligation was enforceable by complainant, citing numerous authorities, among others:  11 Cyc. p. 1078; 13 Cyc. p. 716; 3 Pomeroy on Equity Jurisprudence (3d Ed.), § 1295; *Kirkpatrick* v. *Peshine*, 24 N. J. Eq. 206; *De Gray* v. *Club House Co.*, 50 N. J. Eq. 329; *Bridgewater* v. *Railroad Co.*, 62 N. J. Eq. 276; *Evans* v. *Foss*, 194 Mass. 513 (9 L. R. A. [N. S.] 1039); *Parker* v. *Nightingale*, 6 Allen (Mass.), 341; *Tallmadge* v. *East River Bank*, 26 N. Y. 105; *Trustees of Columbia College* v. *Lynch*, 70 N. Y. 440; *Lewis* v. *Gollner*, 129 N. Y. 227; *Frink* v. *Hughes*, 133 Mich. 63; *Harris* v. *Roraback*, 137 Mich. 292; *James* v. *Irvine*, 141 Mich. 380.

We understand the bill of complaint and the brief to proceed upon the theory, not that a binding contract was entered into between these parties which was enforceable by an action at law, but that the representations, conduct, and actions of the defendants and their predecessors before and since the making of the contract burdened them and

their remaining lands with an equitable obligation. As said in *Tallmadge* v. *East River Bank*, supra:

"Selling and conveying the lots under such circumstances, and with such assurances, though verbal, bound Davis in equity and good conscience to use and dispose of all the remaining lots, so that the assurances upon which Maxwell and others had bought their lots would be kept or fulfilled. This equity attached to the remaining lots, so that anyone subsequently purchasing from Davis any one or more of the remaining lots, with notice of the equity as between Davis and Maxwell and others, the prior purchasers, would not stand in a different situation from Davis, but would be bound by that equity."

Treating this suit as one which, though praying for an injunction, is in the nature of an action for the specific performance of an equitable contract, which, having been entirely executed on the one part, may be enforced against the other parties, it is apparent that the complainant has failed to establish the contract as set forth in his bill of complaint. The bill of complaint alleges the contract or representations to have covered the tract north of Grand River avenue and between Avery and Trumbull, without distinction as to any street within the tract. It appears that in 1896, when the complainant entered into the second contract, numerous lots had been sold in this tract, elsewhere than on Commonwealth avenue, of a width of less than 50 feet, and that buildings which did not comply with the restrictions had been erected. While it is true he claims that he was only interested in Commonwealth avenue, it seems clear that the erection of buildings on Avery and Trumbull avenues near complainant's lot might have as evil an influence over its value as the erection of buildings at the southern boundary or in the northern part of the tract. At all events, the complainant saw fit to state definitely in his bill of complaint what the representations and agreement actually were; and, having done so, he is required to prove the contract which he desires enforced substantially as stated.

We are not satisfied that the evidence of Mr. Stott is

entirely candid with reference to the reason assigned for not adhering to the statement of the agreement as contained in his bill of complaint, but we are of the opinion that he reformed his statement in consequence of the answers of the defendants setting forth numerous departures from the agreement as alleged, which must have been within his knowledge. *Brown* v. *Brown*, 47 Mich. 378. We are further of the opinion that complainant by his own conduct has shown himself not to be entitled to equitable relief. It appears from his own testimony that he knew that these lots were to be sold at auction under different restrictions than he claimed he was entitled to enforce against them. He took no steps to forbid the sale, so far as prospective purchasers were concerned, and gave them no notice whatever of any rights which he claimed attached to their property, but, on the contrary, authorized them to suppose that the sale was a legal one from his standpoint by purchasing a lot himself. He waited from the 9th of November until the 30th day of April before filing his bill for an injunction, at which time there was no ground for an injunction; the property having been contracted to innocent purchasers without notice. As stated in *Bridgewater* v. *Railroad Co.*, 62 N. J. Eq. 276:

"The very object of the courts in raising such implied covenants, and permitting their enforcement by any purchasers under the general plan, is to secure, not damages to the actor in the enforcement, nor an ascertainment of the proportion of injury done to him, but the specific observance of the general plan for the benefit of all who have purchased the right of that observance."

It is clear from the testimony in this case that the ascertainment of the damages flowing from the failure to enforce the restrictions is very difficult; complainant's expert testifying that, so far as the damages due to the failure of maintaining the restrictions were concerned, an estimate was mere guesswork. It might well be said, where the person violating the agreement to enforce the restric-

tions had done so without the knowledge of the person complaining, or opportunity on his part to enforce his rights by injunction, that he might enforce them by an action in equity, if that were the only action open to him, as we are inclined to think it is; but we do not think it should be permitted to a complainant who, as in this case, with knowledge that his rights are being violated, and having time and opportunity either to file his bill for an injunction, or to charge all the parties at the sale with notice of his rights, stands by and permits the sale to proceed without notice to the purchasers, so as to render relief by injunction impossible. In such a case we think the complainant is not entitled to recover. *Hatch* v. *Cobb*, 4 John. Ch. (N. Y.) 559; *Kempshall* v. *Stone*, 5 John. Ch. (N. Y.) 193; *Morss* v. *Elmendorf*, 11 Paige (N. Y.), 277; *Milkman* v. *Ordway*, 106 Mass. 232–253; *Hazen* v. *Lyndonville Nat. Bank*, 70 Vt. 543; *Mack* v. *McIntosh*, 181 Ill. 633; 1 Pomeroy on Equity Jurisprudence (3d Ed.), § 237; *Lamb Knit-Goods Co.* v. *Lamb*, 119 Mich. 568; *Brown* v. *Gardner*, Har. (Mich.) 291; *Beal* v. *Chase*, 31 Mich. 490; *Perry* v. *Reed*, 147 Mich. 146.

The decree is affirmed.

GRANT, MONTGOMERY, MOORE, and MCALVAY, JJ., concurred.