### ALLEN v. CITY OF DETROIT.

### FRUMVELLER v. POST.

1. DEEDS—BUILDING RESTRICTIONS—EASEMENTS.

Building restrictions limiting a tract of several lots to residence purposes only are valid restrictions upon the several portions of the divided parcel, and are in the nature of reciprocal negative easements, constituting a substantial property right which the owners can maintain and enforce.[1]

2. SAME—PARTIAL RESTRICTIONS.

Although some lots may have written restrictions imposed upon them and some have none, if the general plan has been maintained from its inception, if it has been understood,

[1] Construction and effect of general restrictive covenants against use of real property for purpose offensive or detrimental to neighborhood, see note in 9 L. R. A. (N. S.) 1039.

accepted and relied upon by all in interest, it is binding and
enforceable on all *inter se* and runs with the land, binding
all purchasers equally.

3. PARTIES—EQUITY—INJUNCTION — NECESSARY PARTIES—VENDOR
AND PURCHASER.

In a suit to enjoin a municipality from erecting a fire depart-
ment station upon land restricted to residence purposes, the
grantor of the lots sold to the municipality for its purposes,
by whom the original restrictions were imposed, was a party
to the case so as to meet the objection that he was a neces-
sary party where a cause in which he was made defendant to
a bill for specific performance was consolidated with the
injunction suit and both causes heard as one by consent.

4. MUNICIPAL CORPORATIONS — CONSTITUTIONAL LAW — BUILDING
RESTRICTIONS—EMINENT DOMAIN.

Building restrictions are binding upon cities as well as upon
individuals and cannot be violated without first determining
the necessity for taking the property rights created thereby,
and the compensation due to the parties in interest by pro-
ceedings in eminent domain.   Const. 1909, art. 13, § 1.

5. POLICE POWER—FIRE PROTECTION—VESTED RIGHTS—DUE PRO-
CESS OF LAW—CONSTITUTIONAL LAW.

A city may not under its general police power erect a fire en-
gine house within a district restricted by conveyance and
agreement to residence purposes, without action under the
general condemnation laws.

6. SAME.

Police power is regulative and restrictive only, limiting and
dictating the owner's use of property for public safety, but
it never extends to depriving him of it for the public benefit.

7. SPECIFIC PERFORMANCE— NOTICE OF PRIOR CONTRACT TO SELL
—LAND CONTRACT—VENDOR AND PURCHASER.

Where a vendee of land held under a contract of sale upon install-
ments, after paying nearly a fourth of the price, surrendered
by a written agreement his interest in the land in order that
the land might be conveyed to a subsequent vendee by the
owner of the title, who agreed to account to the vendee in
the contract for all that he might receive over and above the
purchase price stated in the contract, one who obtained the
rights of the vendee by purchase, having notice of the entire
situation, was in no better position than the vendee under the
land contract, and took subject to the rights already ac-
quired by the second vendee.

167 MICH.—30.

8. SAME—COSTS.
    The bill for specific performance being unnecessary and serv-
        ing only to complicate the injunction case with which it was
        · consolidated, the defendants were entitled to costs on appeal
        though conditional relief was granted to complainant.

Appeal from Wayne; Murphy, J.   Submitted June 8,
1911.  (Docket No. 19.)  Reargued October 11, 1911.  De-
cided November 23, 1911.

Bill by Mark W. Allen and others against the city of
Detroit and others for an injunction restraining defendant
city from erecting a fire station on property restricted to
residences only.   Bill by Edward Frumveller against Hoyt
Post and others for the specific performance of a land con-
tract.   The two causes were consolidated and heard as
one.   From a decree granting the injunction to said Allen
as against defendants the city of Detroit and others, de-
fendant city of Detroit appeals.   Affirmed.   From a de-
cree dismissing the second bill, complainant Frumveller
appeals.   Modified and affirmed.

*Arthur J. Lacy (Lucking, Emmons & Helfman*, of
counsel), for all complainants.

*Richard I. Lawson (P. J. M. Hally*, of counsel), for
defendants City of Detroit and others.

*Post, Oxtoby & Wilkinson*, for defendant Post.

STEERE, J.   By consent of all parties in interest, the
two above-entitled suits were simultaneously heard in
the trial court upon the same evidence; it being conceded
that they involved substantially the same facts and related
to the same property.   By further stipulation they have
been presented to this court for joint hearing and deter-
mination on the same record, and argued together.

The proposed construction of a fire engine house by the
city of Detroit on land located contiguous to or near that of
complainants' gave rise to this litigation.   The city of

Detroit has appealed from a decree of the Wayne county circuit court in chancery restraining the erection of a fire engine house on the selected site, holding the same to be in violation of a building restriction limiting the district, including the said proposed site, to use for residence purposes, and complainant Frumveller has appealed from a decree denying "at this time" specific performance by defendant Post of a land contract covering lot 163 in the district in controversy, said lot being part of the premises on which it is proposed to erect said engine house.

Previous to July, 1886, defendant Hoyt Post and four others owned together and platted what is known as the "Waterworks subdivision of all that part of private claim 257 east of Cadillac boulevard, and between Mack street and Jefferson avenue, Hamtramck, now in the city of Detroit." As originally platted, the property was not restricted to any particular use. On July 28, 1886, the owners divided the tract among themselves, exchanging deeds for their respective holdings. Defendant Post acquired 18 of the lots as his proportion. He had 11 lots, being Nos. 163 to 173, inclusive, lying contiguous to each other on Hurlbut avenue, which, after holding for some years, he decided to sell under building restrictions, conserving them together as a strictly residential district. Prior to selling any of these lots, he announced and published his general plan to various persons, subsequently making sales on the express understanding and agreement that they should be used for residential purposes only. It is clearly shown that by written restrictions in most of his conveyances, and by specific contracts, written or oral, fully understood, accepted, and acted upon by all who purchased, he subjected all the lots which he sold in that district to such general plan of restriction. These complainants, and all others who purchased, accepted the restrictions, conformed to, and relied on them, building homes on the lots they bought costing from $3,000 to $6,000. This general plan of a strictly residential district, so initiated, has never been departed from by any of

them. An examination of the testimony convinces us that all the restrictions alleged in complainants' bill, such as the exact style of the residences and building line, are not clearly shown to have been imposed upon and strictly observed by all parties as to all lots in the tract, but it is clearly shown that there was a general plan, mutually agreed upon by all parties in interest, mostly in writing, and, when not in writing, entered upon and consistently observed, restricting these eleven lots to residential purposes only.

The testimony fully justifies the following findings by the learned trial judge:

"As to these lots; this plan was published by Mr. Post and his authorized agents in dealings with purchasers and prospective purchasers. The property was so held out to the general public. It was, indeed, this very condition which was one of the inducing causes of all the conveyances made, save possibly two, as hereinafter noted, in the absence of which limitation the sales would not have been effected. * * * There is explicit testimony covering this. There are, moreover, the express restrictions to this effect contained in the deeds of lots 168, 169, 171, 172, and 173. There is the conduct of the parties in interest in the sale of lots 167 and 166. Thus, as to lot 167, complainant Kennedy was told of these restrictions by Post, and that they applied to all the lots before he, Kennedy, received a contract for its purchase. Kennedy, moreover, was obliged to take the plans of his house to Post for approval, and, when the latter gave the contract of sale to Kennedy, it contained an agreement on the vendee's part to proceed immediately with the erection of a 'substantial, two-story frame house according to the plans prepared by Architect Varney.'

"In the purchase of lot 166, Dr. Young was told by Post that this lot and the others were to be used for residences only, and he, Young, was required to present his plans to Post before the latter agreed to sell at all. Dr. Young's house was in point of fact completed before he received the land contract. These facts furnish ample explanation for the omission of the restriction in the deeds of lots 167 and 166, as well as corroboration of the existence of a plan of restriction.

"Lot 170 and part of lot 171 were taken in the opening of Kercheval avenue through this property. Lot 165 is still the property of Post, but upon September 1, 1903, he gave his son-in-law and daughter, Mr. and Mrs. John F. Robinson, a land contract for the purchase of this lot, and immediately thereafter advanced to them the money with which to build a house costing $3,800, in which, since its completion, they have resided and still reside, thus himself conforming to the established plan.

"Lots 163 and 164 had each been sold upon contract by Post, but the rights of one vendee had been surrendered and Mr. Post had acquired the interest of the other vendee for the purpose of effecting this sale to the commission. What representations, if any, had been made to these two vendees does not appear, but there is nothing as to them contravening the proofs otherwise adduced."

A failure to clearly establish some of the other allegations in complainants' bill does not militate against the validity and efficacy of this general restriction to a residential district so clearly proven. It is a substantial property right which the owners can maintain and enforce. The law is well settled that building restrictions of the character shown are in the nature of reciprocal negative easements, and may be created upon a division, and conveyance in severalty to different grantees, of an entire tract. That a portion of the conveyances do not contain the restrictions will not defeat the same. Although some of the lots may have written restrictions imposed upon them and others not, if the general plan has been maintained from its inception, if it has been understood, accepted, relied on, and acted upon by all in interest, it is binding and enforceable on all *inter se*. It goes with the land, and is equally binding on all purchasers with notice. 5 Am. & Eng. Enc. Law (2d Ed.), p. 3; *Tallmadge* v. *East River Bank*, 26 N. Y. 105; *Trustees* v. *Lynch*, 70 N. Y. 440 (26 Am. Rep. 615; *Lewis* v. *Gollner*, 129 N. Y. 227 (29 N. E. 81, 26 Am. St. Rep. 516); *Frink* v. *Hughes*, 133 Mich. 63 (94 N. W. 601); *Harris* v. *Roraback*, 137 Mich. 292 (100 N. W. 391, 109 Am. St. Rep.

681); *James* v. *Irvine*, 141 Mich. 376 (104 N. W. 631); *Stott* v. *Avery*, 156 Mich. 674 (121 N. W. 825). In *Tillotson* v. *Gregory*, 151 Mich. 128 (114 N. W. 10, 25), involving the enforcement of an alleged general plan of restriction in a district where some of the lots were subjected thereto in writing and others were claimed to be under the same restraint by parol, Justice McALVAY, though not finding the allegation sustained by the proofs, says:

"That restrictions of the kind claimed by complainants may be created and held valid is not disputed. Citation of authorities upon that question is therefore not necessary."

The circumstances under which the city of Detroit became interested in the project of erecting an engine house in this district, as disclosed by the evidence, are as follows: In the early summer of 1909 the fire commission inserted an advertisement in the public press for proposals for sites for a fire engine house in that part of the city. In response, among others, a real estate broker named G. F. Bennett, by letter dated June 1, 1909, submitted an offer to sell lots 163 and 164 of said subdivision, embracing 100 feet frontage. He did not then own or control these lots, but had knowledge of them and understood that they were for sale, and could be secured. On June 21, 1909, the commission by resolution voted to purchase 75 feet of the property so offered, comprising lot 164 and the southerly half of lot 163. On June 18, 1909, Bennett had secured from Post a 15-day option on the two lots, and, as the outcome of various negotiations by the parties in interest, Post and wife, on July 22, 1909, executed a warranty deed of the property to Bennett, following which Bennett and his wife executed a deed of lot 164 and the southerly half of lot 163 to the city of Detroit. This deed was dated July 3, 1909, but was not, however, acknowledged until September 15, 1909. In the meantime the fire commission had made further efforts to secure a different site, but finally, on October 11, 1909, they again

voted to purchase said lot 164 and the southerly half of lot 163. Said deeds of Post and Bennett, with an abstract of title furnished by Post, were turned over to the corporation counsel of the city for examination and approval before said vote of October 11, 1909, and were so held by him. September 18, 1909, the assistant corporation counsel indorsed on the margin of the Bennett deed, "Correct in form and execution, entirely satisfactory." Proper steps were then taken by the city officials according to the regular system which obtained to pay the purchase price for the property, ending with an undelivered voucher remaining in the office of the city controller, dated November 6, 1909, indorsed "Held up by litigation, see Mr. Halley before anything done."

Early in these negotiations the city authorities had notice that this property was restricted to residential purposes. A specific notice of that fact and complainants' claims in relation thereto was given to the fire commission on or before the 15th day of July, 1909, at a meeting held in the mayor's office to discuss the matter and consider objections to the erection of an engine house on the proposed site. Shortly after the adoption of the final resolution of October 11, 1909, wherein it was decided to make the purchase, the fire commission took possession of the site, and on November 3, 1909, began excavating for a foundation for the proposed engine house. Complainants protested, and on November 8, 1909, filed their bill of complaint in this suit, and made application for a temporary injunction. The circuit judge to whom application was made denied the same on the ground that the bill of complaint was sworn to on information and belief; that Mr. Hoyt Post, a necessary party, was not made a defendant; and especially that building restrictions could not be enforced against a municipality, refusing, for that reason, to entertain further proof. Application was then made to this court for a writ of mandamus to compel the circuit judge to vacate his order of denial and grant the injunction as prayed for in complainants' bill. An opinion

on said application was rendered in February, 1910 (*Allen*
v. *Wayne Circuit Judge*, 159 Mich. 612 [124 N. W.
581]), in which the writ was denied in the following con-
᾽cluding language :

"As the bill was verified on information and belief, and
there was no proof taken, we cannot issue a mandamus to
compel the allowance of an injunction.   It will be with-
out prejudice to another application, however, if counsel
have confidence that they can allege and prove a valid
contract binding upon and enforceable against the city in
favor of the complainants, all of which questions will be
open on such an application, though not necessarily de-
termined finally thereon."

Following this, the pleadings were perfected in the main
case, and it was regularly heard in the circuit court of
Wayne county.   It is again here on appeal taken by de-
fendants from a final decree.

The objection that Post is a necessary party to the in-
junction suit, and should be made a defendant, is not well
founded.   In *Allen* v. *Wayne Circuit Judge*, *supra*, it
was said :

"Again, the fact that Mr. Post was not made a party
is unimportant.   *   *   *"

Since that decision there has been an equitable consoli-
dation of these two cases, and he is now to all intents and
purposes a party.   These cases have been heard together
in the trial court, and come here on the same record, with
the same testimony and objections.   Post was considered
and treated by court and counsel and all in interest as a
party in both cases.   He testified as a witness, his counsel
examined witnesses, filed briefs, and participated in oral
argument in each case in both courts as they saw fit.

Under the views already expressed, the judgment of
the trial court should be sustained in the Allen branch of
these proceedings, unless municipalities are immune from
the rules of law which apply to private parties touching
building restrictions.   That question would seem to be

foreclosed by the following language in *Allen* v. *Wayne Circuit Judge, supra:*

"We are satisfied that a valid building restriction may be binding upon a city as well as an individual, and, before it can use a lot charged with such restriction for a purpose prohibited by the restriction, it must obtain, by purchase or condemnation, the title of all owners of any interest therein, and, when it has not done so, equity may properly intervene to preserve the *status quo* until such interests are acquired, provided the pleading and the evidence supporting the application show a reasonable probability of the validity and justice of complainants' claim."

No authorities have been cited in that connection, and it has been suggested that, as an adjudication on the point was not essential to a disposition of the issue then before the court, it is *obiter dictum*, and the question yet open for consideration. After an examination of the authorities, we are well satisfied that, whether dictum or not, it is a correct statement of the law of this case, based on the fundamental, constitutional provision, that—

"Private property shall not be taken by the public nor by any corporation for public use, without the necessity therefor being first determined and just compensation therefor being first made or secured in such manner as shall be prescribed by law." Const. 1909, art. 13, § 1.

Building restrictions are private property, an interest in real estate in the nature of an easement, go with the land, and are a property right of value, which cannot be taken for the public use without due process of law and compensation therefor; the validity of such restriction not being affected by the character of the parties in interest. Randolph on Law of Eminent Domain, § 79; Nichols on Power of Eminent Domain, §§ 39, 47, 48, 173; Mills on Eminent Domain, §§ 30, 31; 1 Lewis on Eminent Domain, §§ 224–233; 15 Am. & Eng. Enc. Law (2d Ed.), p. 602; *Patton* v. *Gilmer*, 42 Ala. 548 (94 Am. Dec. 665); *Story* v. *Railroad Co.*, 90 N. Y. 122 (43 Am. Rep. 146); *City of Chicago* v. *Ward*, 169 Ill. 392 (48 N. E. 927, 38 L. R.

A. 849, 61 Am. St. Rep. 185); *Ladd* v. *City of Boston*, 151 Mass. 585 (24 N. E. 858, 21 Am. St. Rep. 481).

The contention that the city under its general police power may ignore this building restriction, and erect its fire engine house within the restricted district because it is necessary for the public good and to protect the lives and property of citizens in that locality, is not tenable. When such action deprives the individual of a vested right in property, it goes beyond regulation under police power, and becomes an act of eminent domain governed by the appropriate condemnation laws. Police power is regulative and restrictive only, limiting and dictating the owner's use of property for public safety, but never extends to depriving him of it for public benefit. The distinction is clearly pointed out in the early case of *Commonwealth* v. *Alger*, 7 Cush. (Mass.) 84, 85, as follows:

"Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient.

"This is very different from the right of eminent domain, the right of a government to take and appropriate private property to public use, whenever the public exigency requires it; which can be done only on condition of providing a reasonable compensation therefor."

This case has often been cited with approval, and the authorities seem to sustain it unanimously. 1 Dillon on Municipal Corporations, § 301; Freund on Police Power, §§ 511, 512; Russell on Police Powers of the State, p. 86; Tiedeman on Limitations of Police Power, p. 423; 1 Lewis on Eminent Domain, pp. 14, 15; Nichols on Power of Eminent Domain, § 17; *In re Cheesebrough*, 78 N. Y. 232; *Surocco* v. *Geary*, 3 Cal. 69 (58 Am. Dec. 385); *Field* v. *City of Des Moines*, 39 Iowa, 575 (18 Am. Rep. 46); *McDonald* v. *City of Red Wing*, 13 Minn. 38 (Gil.

25); *Stone* v. *City of New York*, 25 Wend. (N. Y.) 157; *Kinnie* v. *Bare*, 68 Mich. 625, 629 (36 N. W. 672).

The right of the city to purchase this property from Post as the two may agree is undisputed. Neither is there any question of the power of the city under the law of eminent domain to acquire, and relieve the property of, the restrictive interests vested in complainants. It is objected that such an expedient would be so complicated and expensive as to amount practically to prohibition in certain extensive residential portions of the city where such restrictions exist and fire protection is greatly needed. Condemnation proceedings are a last resort when other efforts to secure needed private property for public use fails. They are, as a rule, complicated and expensive, but, in proceedings to relieve a lot from building restrictions, only the owners of property in the same subdivision, mutually burdened with the same restrictions, are necessary parties. In this case the territory comprises 11 lots all told. In a larger subdivision under building restrictions, and for which fire protection is seriously demanded, it can well be said that little difficulty would be experienced with those whose lots are not in close proximity to the proposed site.

In the *Frumveller Case* complainant seeks to enforce specific performance of a land contract for the purchase of said lot 163 given by Post to one John W. Clark on March 1, 1904. On March 23, 1910, complainant bought from Clark his interest in said contract, and on April 15, 1910, tendered to Post the admitted unpaid balance thereon, computed at $685, and demanded his deed. This was refused on the ground that Clark had surrendered his contract to the parties who had taken charge of the matter for the purpose of making a sale of this lot, in connection with lot 164, to the city, having executed a deed of it to Bennett, who, in turn, had conveyed one-half of said lot, together with lot 164, to the city. The conveyances had been turned over to the city authorities, being then held by the corporation counsel, pending this litigation, after examination and approval. Before proceeding with

any negotiations looking to the sale of this property to the city, Post took the precaution to obtain from Clark his land contract for lot 163, together with a written surrender thereof. Across the contract was written, "Surrendered for cancellation Sept. 16, 1909," which statement was signed by Clark. Clark testifies that Exhibit D correctly states all of his bargain with Post. It is as follows:

"This is to certify that I have in my possession a certain land contract running from me to John Clark for the sale of lot 163, Waterworks subdivision, etc., consideration $900, of which $600 is still due, with interest from June 1st, 1909, and paving tax of about $42, and the city taxes for the current year of about $12, which I have paid. Said lot is now in process of sale for the sum of $1,150, and, when sold, I am to receive the money and account to him for all sums in excess of amount due me on said contract, together with interest and disbursements as aforesaid.

"Dated Sept. 20, 1909.

[Signed]     "HOYT POST,
          "By I. J. RADCLIFFE."

It is claimed in that connection that this was not a complete surrender of the contract, but only an arrangement for Post to act as agent for Clark in disposing of the property. In our view of the case that question is immaterial. He surrendered the land contract for the purposes of this sale. If the same is not consummated, his rights under the contract become operative again. The bill of complaint in the *Allen Case* was filed November 8, 1909, since which time the matter has been involved in litigation and held in suspense. The complainant purchased Clark's interest with full knowledge of the situation, as is clearly shown by Clark's testimony, and not disputed. He is in no better position than Clark would be. It was the understanding in connection with Exhibit D that no interest on the $600 yet due to the parties would be charged to Clark after September 20, 1909. Under this agreement, and relying on it, Post negotiated the sale, and turned the deeds over as stated. They are now in the possession of the

city authorities, to be accepted or rejected within a reasonable time after this litigation is ended.

The decree of the court below should be modified, requiring the city to act and elect whether it will make the purchase or not within 60 days after resettlement of the decree. If the deed is accepted, Post should account to the complainant according to the terms of Exhibit D. If the deed is rejected, Post should convey to complainant said lot 163 according to the terms of the Clark contract, making no charge in either case for interest after September 20, 1909.

This suit for specific performance of the Clark contract was unnecessary and only served to complicate the situation; therefore defendants will recover costs in that branch of the case.

In the Allen branch of the case decree is affirmed, with costs.

OSTRANDER, C. J., and BIRD, MOORE, MCALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.