## CASTERTON *v.* PLOTKIN.

1. DEEDS—RESTRICTIONS—COVENANTS—CONSTRUCTION.

 A conveyance of a city lot with the restriction that it should be used for residence purposes only, limiting the height of buildings to two stories and fixing the cost, distance from street, etc., did not exclude the erection of an apartment house; and no further or different limitations to those expressed in the deed might be implied.

2. SAME—INTERPRETATION—BUILDING RESTRICTIONS.

 Such restrictions are construed strictly against the grantor and those claiming to enforce them, all doubts being resolved in favor of the free use of the property.

3. SAME—RESIDENCE PURPOSES—BUILDING RESTRICTIONS.

 Where the owner of a parcel of land sold part of the property subject to building restrictions limiting its use to residence purposes only and not expressly providing that only single dwelling houses should be erected on each lot, and where no deed in defendant's chain of title contained such restriction, although it appeared that other conveyances in the block had been interpreted by the owners of the property as excluding apartments and business structures, and where defendant was not shown to have

had notice of complainants' claim that all the property along the block was subject to such restriction, the court erred in restraining defendant from erecting an apartment house upon his land, since no acts of the grantor in the original conveyance, done subsequently to the purchase by complainant or his predecessors in title, could affect his rights under the conveyance.

4. SAME—NOTICE.

It is not a general rule recognized by the courts that the mere construction of single dwellings or adoption of any particular style of architecture is notice to the owner of a lot within the block or neighborhood that the property is all restricted to residential or other purposes.

5. SAME—EVIDENCE.

Proof that the defendant necessarily observed that the street on which his lot faced was a residence street of single houses on each lot and that no business places or apartments fronted thereon, that other proprietors adjoining his property observed the rule of restriction, was not notice which would charge the defendant with information that a general plan of restrictions had been adopted for the street which would be binding upon him, especially upon his express testimony that the agent who sold him the property told him it was not restricted and could be used for business purposes, and that the attorney who examined his abstract advised him that he might build an apartment upon the lot as he intended, when he made the purchase.

6. SAME.

The rule that parol restrictions control all lots in a subdivision that has been platted under a general plan and consistently carried out as to all property and accepted by all persons in interest is not applicable to persons not participating in the acts or declarations of those platting it but acquiring the property prior to such parol declarations or limitations.

7. SAME—EQUITY.

The mere fact that the conduct of defendant in relation to the property was open to criticism was not sufficient reason in equity for enjoining him from constructing an apartment house, in the absence of sufficient evidence that he had clearly violated restrictive conveyances in the chain

of title: courts of equity will not aid complainant in re-
straining the use of another's property unless the right
to the restraining order is plain.

Appeal from Wayne; Murphy, J.  Submitted April
26, 1915.  (Docket No. 103.)  Decided September 29,
1915.

Bill by Walter J. Casterton and others against Sam-
uel Plotkin to enforce certain building restrictions.
From a decree for complainants, defendant appeals.
Reversed.

*Dohany & Hersch*, for complainants.

*Earl I. Heenan* and *Jasper C. Gates*, for defendant.

STEERE, J.  On July 23, 1906, Mary C. Gamble, the
then owner, recorded in the office of the register of
deeds of Wayne county her plat of "City Heights sub-
division of the south 330.70 feet of the north ½ of ¼,
section 24—10,000-acre tract," being a strip of land,
of the width stated, in the village of Highland Park,
lying adjacent to the north boundary of the city of
Detroit, extending east and west between Woodward
and Oakland avenues, which run north and south, Oak-
land being east of Woodward.  Through the center of
this strip, as platted, Tennyson (also called St. John)
avenue runs east and west the entire length from
Woodward to Oakland, crossing John R. street, which
runs north and south between the two named avenues
through the subdivision.  The strip is subdivided into
124 lots, 6 of which are fronted on Woodward avenue.
The remainder front along both sides of Tennyson
avenue, the 2 farthest east lying against Oakland.

Defendant Plotkin now owns lot 66 of the subdi-
vision, and this suit was brought to restrain him from
erecting upon it a brick veneer, two-story, 14-family
apartment building.  This lot is at the extreme south-

eastern corner of the plat, a corner lot, fronting 44.30 feet on the south side of Tennyson avenue, its east side abutting 131.35 feet on Oakland avenue, which, at the time this suit was commenced, was a business street occupied by a double-track street railway line, with places of business of various kinds extending along it on both sides in the vicinity of and opposite where Tennyson avenue joins it. At the other end of the subdivision, where Tennyson avenue joins Woodward, the six lots fronting west on Woodward had upon them a number of stores and apartment houses, the corner stores having entrances from Tennyson as well as from Woodward avenue.

The recorded plat of this subdivision contains no restrictions. Lots 1 to 6, inclusive, fronting on Woodward avenue, were sold for business purposes without restrictions. One hundred and twelve lots in the subdivision were sold and conveyed with restrictions limiting their use to residence purposes only, but a single house to be built upon the premises, not less than two stories in height, 22 feet from the front street line, and costing not less than a specified sum. The remaining six lots, including 66, were sold under limitations which did not contain the express restriction to a single house, merely prescribing that the use should be "for residence purposes only," the restrictions in that particular being in all six substantially as in defendant's deed, which is as follows:

"This lot is restricted for residence purposes only, and no building is to be erected on the same with a flat roof or more than two and one-half stories in height and to conform to the building line of the street, being not nearer than 22 feet to the street line, and costing not less than $2,500."

It is shown, and cannot seriously be denied on this record, that the proposed building complies with the letter of all these requirements. The testimony dis-

closes, however, that there are now 107 single dwelling houses upon Tennyson avenue, which is a strictly residence street, except the Woodward avenue end.

Complainants claim, with supporting testimony, that when Mary Gamble platted and offered this subdivision for sale, it was her purpose to limit the Tennyson avenue frontage not only to residential purposes, but to single dwelling houses, so instructing her agents to whom she intrusted its management and sale, and that this plan has been published, insisted upon, acquiesced in by purchasers who built, and consistently observed, until defendant sought to violate it.

Defendant's title to lot 66 originated from the owner of this subdivision June 3, 1907, in a contract of sale given by her to John and Loie Cramer, containing the same restrictions, so far as material here, found in defendant's deed. No restriction such as that sought to be enforced here—to a single dwelling house—is found in any of the conveyances in his chain of title. The records further show that the title of each of the complainants in this suit originated from the same owner of the subdivision subsequent to June 3, 1907.

Inasmuch as defendant's deed does contain restrictions specifying just what use can, or cannot, be made of the property, and sets limitations for the kind of building which may be built, nothing further or different is to be implied.

"Restrictions in deeds will be construed strictly against the grantors and those claiming to enforce them, and all doubts resolved in favor of the free use of the property." *James* v. *Irvine,* 141 Mich. 376 (104 N. W. 631). See, also, *Walker* v. *Renner,* 60 N. J. Eq. 493 (46 Atl. 626).

In the *James Case, McMurtry* v. *Investment Co.,* 103 Ky. 308 (45 S. W. 96, 40 L. R. A. 489), is cited, which is a suit brought to restrain the erection of an apartment house in violation, as was urged, of residence

restrictions similar to those in defendant's deed. In denying relief that court said:

"It is shown, indeed admitted, that these different apartments or flats are places for persons to reside in, but it is contended that the language of the restriction conveys the idea of a single residence for a single family, or at any rate excludes the idea of a number of residences under the same roof or in the same house.

"We think, however, that to give the language used this meaning would be to extend its scope beyond the expressed intention of the parties. The purposes for which the house is to be erected on the court were 'residence purposes only.' * * * If the intention had been to permit the erection of only segregated private residences, the instrument would doubtless have so provided."

At the time Mary Gamble sold this lot in 1907, parting with right of possession and control of the title, restricting its use "to residence purposes solely," she yet owned this entire subdivision, so far as the records disclose, subject to no restrictions, with the exception of one lot, No. 8, near Woodward avenue, to the west of John R. street, in another block, and over a third of a mile distant from Oakland avenue. This had been sold with restrictions for a single house. If it were to any degree inferable that such conveyance of lot 8 indicated a general plan of restriction to single dwellings, extending as far as Oakland avenue at the extreme end of the subdivision and in another block, it was then impliedly negatived and abandoned by the sale of lot 66 limited to residence purposes solely, made by the same owner of the subdivision before any improvements were started in the subdivision. It is not shown that there was at that time anything else in the plat as recorded, conveyances given, or condition of the subdivision itself to impress the contract given for lot 66 with restrictions other than those embodied in it. Manifestly no subsequent conveyances or acts of Mary Gamble or others to which defendant or his pred-

ecessors in title were not parties and in privity could affect his title or change the restrictions imposed on lot 66. Defendant's chain of title shows that his predecessors did not recognize in their conveyances any restriction to a single house, nor in that particular enlarge the conditions imposed when Mary Gamble sold this lot on June 3, 1907.

Clearly the restrictions which she imposed would not have been violated had the purchaser then proceeded to erect upon the lot an apartment house for residence purposes solely. He was under no obligation to improve the property. Allowing the lot to remain vacant imposed no duty upon the owner to watch and object to what others were doing with other lots in the subdivision, in order to protect this vested right. Other purchasers were, in fact, using their lots for residential purposes in harmony with the very use to which lot 66 was restricted. No court has gone so far as to intimate a rule that the mere building of single dwellings or the adoption of any particular style of architecture by others in a block is notice to the owner of a lot only restricted to residential purposes that he must do likewise or protest in order to protect his rights.

It is urged for complainants that not only was a uniform plan for single dwelling houses announced in the beginning, but that it has consistently been adhered to by all parties in interest since, recognized as binding and enforceable upon all who purchased in the subdivision, in reliance upon which many bought lots and established homes there. It is shown in that connection that this was advertised as a strictly residential subdivision when put upon the market; that a sign heralding that fact was placed at the entrance of the avenue; that an advertisement, with flaming headlines and a tracing of the plat, was published in a Detroit paper, and dodgers were circulated stating,

"Building restrictions for residences only; no flats or stores." Copies of these dodgers and notice of sale in the public press produced in evidence indicate that these enticing restrictions apply to the entire plat delineated above them, including the Woodward avenue end, which was sold without restrictions and upon which there are "flats and stores." Amongst the many inducements portrayed in these notices we find no mention of the use of each lot being limited to a single house or dwelling. The advertisement also prominently states:

"Building line restriction is 22 feet from street line on each side, making a distance of 104 feet between the fronts of the houses on the avenue."

This restriction was embodied in the conveyances of all lots fronting on Tennyson avenue, and is shown to have been consistently violated, in the particular that the verandahs of most of the houses built encroach nearly eight feet beyond the specified line, and in numerous cases bay windows project a substantial distance beyond it. In *Ogontz Land, etc., Co.* v. *Johnson*, 168 Pa. 178 (31 Atl. 1008), a suit brought to enjoin construction of a porch beyond building line restrictions, the court said:

"While merely incidental encroachments on this space by steps, or eaves, or ornamental projections might not amount to violations of the agreement, * * * yet a porch extending the whole width of the house as a substantial and integral part of it is clearly so. If it can occupy 8 feet of the reserve space, it could as well occupy the whole 15 feet to the fence line, and thereby destroy the open, uniform, general effect meant to be secured."

See, also, 4 Ballard on Real Property, § 148, and cases cited.

As most purchasers in the subdivision who bought after lot 66 was sold were restricted to single dwellings,

and built in compliance with their restrictions, and it was represented by the owner of the plat and her agents that all purchasers were or would be so restricted, it may be fairly said to have been the general understanding amongst those interested and located along Tennyson avenue that such was a universal restriction, and an enforceable plan for Tennyson avenue frontage. But lot 66, which had a side frontage on Oakland three times greater than its end frontage on Tennyson, was sold before complainants purchased, or any of these improvements were made, with its defined restrictions which have been consistently repeated in subsequent conveyances by succeeding owners who are not shown to have participated in or acted upon or in their conveyances recognized the subsequently developed scheme, or plan, of restricting this residential district to single dwellings only, or to have waived any of their vested rights as granted and evidenced in their muniments of title. It is an elemental rule that one person is without the least power or capacity, in the absence of delegated authority, to release or change the rights of another in land. *Coudert* v. *Sayre*, 46 N. J. Eq. 386 (19 Atl. 190).

Under the general proposition of law that a general plan of restriction such as shown here is valid and enforceable and the fact that a portion of the conveyances do not contain the restriction may not defeat the same, it is contended by complainants that subsequent conditions developed on Tennyson avenue which brought lot 66 under the single dwelling restriction, and defendant was a purchaser with actual notice that such was the case. The proof to sustain this is that he actually saw, and necessarily noticed, Tennyson avenue was a residence street of attractive homes, with single houses on each lot and no apartment houses or business places fronting upon it. As conditions then existed, he also saw that this comparatively short street

terminated at either end in business sections upon important business thoroughfares; that the lots in this subdivision on Woodward avenue were devoted to business purposes, and lot 66 at the other end of the plat, with a side abutment of over 130 feet on Oakland avenue, was occupied by a real estate office. He testified, and it is not disputed, that he talked with and bought the lot from a real estate agent, who had the property for sale, in an office on the lot, and who told him it was not restricted, but could be used for business purposes the same as the Woodward avenue end; that he tentatively made the purchase with that understanding, making a deposit of $50, and then obtained an abstract which he submitted to an attorney, who advised that he could build an apartment building upon the property, and he accordingly closed the purchase, had plans prepared for a $20,000 apartment building, made available by the Oakland avenue frontage to comply with the restrictions in his deed and abstract as to roof, height, and 22-foot distance from the Tennyson street line, and was proceeding to build when warned and forbidden by complainants, who, when he did not desist, restrained him by this suit.

Can it be said that what he saw or was told operated as legal notice that all this subdivision, or even every lot fronting on Tennyson avenue, including 66, lying against Oakland, was restricted to a single dwelling? Though told by the agent on the premises that this lot, located along a business street, was unrestricted, he obtained an abstract and consulted counsel before closing the deal. Finding it restricted to residence purposes only, he was content to purchase and to comply with the restrictions as disclosed by his abstract. The rule of restrictions resting in parol as to certain lots in a subdivision under a general plan, developed and consistently maintained, has not yet been carried in its application to previously acquired titles not so

restrained, held by non-participants and their grantees who are strangers to the plan with antedating rights.

The cases of *Tillotson* v. *Gregory,* 151 Mich. 128, 132 (114 N. W. 1025), and *Allen* v. *City of Detroit,* 167 Mich. 464, 469 (133 N. W. 317, 36 L. R. A. [N. S.] 890), cited and relied upon as sustaining complainants' position, involved and turned upon other facts and principles than those disclosed here. The broad rule that under certain circumstances a general plan of restriction to certain purposes may be initiated, maintained, acted upon, and accepted by all in interest to a point where it becomes binding on lots not otherwise restricted in a generally restricted subdivision was there recognized, but in the *Tillotson Case* the court found from the proofs no such restriction as contended for, held that a restriction in defendant's title "for residence purposes only" was not violated by the erection of a four-family flat, and dismissed complainant's bill; while in the *Allen Case* it appeared that the original owner of the subdivision, who previously had, by written restrictions in most of his conveyances and by distinct contracts written or oral in all cases, "fully understood, accepted, and acted upon by all who purchased," subjected all lots sold by him in that district to a general plan limiting their use to residential purposes, was himself thereafter negotiating a sale of a lot and a fraction to the city without restrictions, for the erection of a fire engine house upon it. Notice was served upon the city by previous purchasers from him of neighboring lots who had erected homes upon them before the sale was consummated. It was held the original owner who initiated and was responsible for such general plan of restriction to residential purposes might not sell without adhering to his plan, and that the city, having been timely notified and fully informed, would take subject to such plan if it purchased. Here, as already pointed out, complainants are subse-

quent purchasers under restrictions not originally imposed upon defendant's title, and which they now seek to impose, a very different proposition from a subsequent purchaser taking the benefit of restrictive covenants expressed in a prior purchase.

We fail to find in the cases cited by complainants, too numerous to review at length, that the rule contended for has been enforced under facts analogous to those disclosed here. In many of the cases referred to the restrictions to be interpreted and sought to be enforced were contained in the defendant's own deeds or chain of title; in others their titles originated from the owner of the subdivision subsequent to that of complainants, in whose favor rights had arisen of which defendant had express notice, or by active participation had become parties to a general, developed plan of restriction.

It may be conceded, as insisted by complainants, that defendant's conduct and retorts in connection with his building project indicate that neither his presence nor proposed improvements are desired or desirable in that community; but that alone will not justify an injunction. Equity follows the law, and equity courts are not yet endowed with power to enforce the golden rule against the cupidity of those acting under strictly legal rights of property. Complainants have failed to establish a proposed violation by defendant of any of the restrictive covenants in his chain of title, or to clearly show that subsequent events have by legal implication imposed additions to such original restrictions. Courts of equity do not aid one man to restrict another in the use to which he may put his property unless the right to such aid is clear. *Fortesque* v. *Carroll,* 76 N. J. Eq. 583 (75 Atl. 923, Am. & Eng. Ann. Cas. 1912A, 79); *Camovito* v. *Matthews,* 82 N. J. Eq. 218 (88 Atl. 187).

From the foregoing views it follows that the decree

of the lower court will be reversed, and complainants' bill dismissed, with costs to defendant.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

Justice MCALVAY, who sat in the case, took no part in this decision.