## HARTWIG *v.* GRACE HOSPITAL.

1. DEEDS—COVENANTS—BUILDING RESTRICTIONS.

There is a violation of the restrictive covenant in a deed against the erection of anything but a residence and buildings pertaining thereto by the remodeling of an existing dwelling and using it as a hospital.[1]

2. SAME—BUILDING RESTRICTIONS—PRESUMPTIONS.

The character of a building restriction in a deed to land *held*, to raise the presumption that such restriction was intended for the benefit of subsequent purchasers, especially when the quantity of the land affected and its general location are considered.

3. SAME.

A building restriction in a deed to land, inserted for the benefit of the land retained by the grantor, may be enforced by subsequent purchasers *inter se*.

4. SAME—VIOLATION OF BUILDING RESTRICTIONS—ACQUIESCENCE— INJUNCTION.

Long acquiescence in the violation of a building restriction in a deed to land limiting the use of the land to residence purposes by the changing of a residence thereon into a hospital will defeat the right to enjoin such violation when only by the making of expensive changes in the structure could the residence character of the building be restored.

5. SAME—BUILDING RESTRICTIONS—"RESIDENCE."

A home for nurses of a hospital is not a residence within the meaning of a building restriction in a deed to land.

Appeal from Wayne; Codd, J. Submitted June 15, 1917. (Docket No. 59.) Decided December 27, 1917.

Bill by William J. Hartwig and others against the Grace Hospital to enjoin the violation of building restrictions. From a decree dismissing the bill, plaintiffs appeal. Reversed in part.

---

[1]For authorities discussing the question as to whether a multiple residence structure is a violation of restrictive covenant, see note in 45 L. R. A. (N. S.) 726.

*Corliss, Leete & Moody,* for plaintiffs.

*Angell, Bodman & Turner* and *C. G. Dyer,* for defendant.

Prior to September 30, 1897, the heirs of Bela Hubbard owned a block bounded by West Grand boulevard, Vinewood avenue, Lafayette boulevard, and Porter street, and other lands in the vicinity, in a division of which lands title to the southerly 400 feet of the block was on the day aforesaid vested in Henry G. Hubbard, evidenced by a deed dated on that day, made by Collins B. Hubbard and others as grantors, and recorded. The deed contained the following:

"Provided, however, and as a part of the consideration hereof, its conveyance is made subject to the following conditions, to wit: Up to and until the 1st day of January, 1925, no building other than a residence and buildings pertaining thereto shall be erected upon said premises. No bay window, approach, or other structure to be erected or placed within 30 feet of the boulevard and Vinewood avenue. Up to the date last aforesaid no residence building shall be built or placed on said premises costing less than $2,500 fronting on the boulevard, or less than $2,000 if fronting on Vinewood avenue. Upon any breach of the foregoing conditions, or any part thereof, the title hereby conveyed of the property upon which said breach is made shall revert to and vest in the parties of the first part, their heirs and assigns, forever, and it shall be lawful for the first party, their heirs and assigns, to re-enter upon said premises, and the party of the second part, his heirs and assigns, to remove and put out."

After the decease of Henry G. Hubbard, his heirs conveyed the land aforesaid to Hubbard Land Company, a corporation created to sell the property, which sold it on land contract to Frank A. Reed, who in May, 1906, subdivided it, made a plat, as shown by the annexed drawing, and recorded it. No evidence of restrictions is found in the plat.

All deeds of the lots in this plat were. made by the Hubbard Land Company as grantor. Lot 1 was deeded March 22, 1906, to Jessie Kennedy, with no restriction in the deed. Lot 4 was deeded June 7, 1906, to Angus H. Cameron; the deed containing the condition following:

"(1) No building other than one single tenement dwelling house shall be erected upon said premises, and no bay window, porch, or other structure shall be erected or placed within 30 feet of the boulevard.

"(2) No single tenement dwelling house shall be built or placed on said premises costing less than $3,000.

"(3) No fences or buildings, except the one single tenement dwelling house described, shall be erected on the above-described premises while the main entrance of the house on lot 2 of the above subdivision faces the south as it now does.

"Upon breach of the foregoing conditions, or any part thereof, the title hereto conveyed to any person or persons of the above described premises * * * shall revert to and vest in the party of the first part."

Lot 5 was conveyed to William R. Kales March 22, 1906; the deed containing conditions 1 and 2 as above, except that after the word "dwelling house" there is inserted, "and buildings appertaining thereto." Lots 6 and 7 were deeded to John A. Mercier and wife March 22, 1906, the deed having the same conditions as the deed to Kales, except that the minimum cost of a dwelling house is not inserted. Lots 8 and 9 were conveyed to Etta E. Reed January 3, 1908, the deed containing conditions found in Kales' deed, except in paragraph 2 the minimum cost of house is fixed at $2,000. Lot 10 was conveyed to Jacob Seidel and wife August 10, 1908, with the conditions:

"(1) No building other than one single tenement dwelling house and buildings appertaining thereto shall be erected upon said premises, and no bay window, porch, or other structure shall be placed within 30 feet of Lafayette or Vinewood avenue.

"(2) No single tenement dwelling house shall be built or placed upon said premises costing less than $2,000."

Lot 11 and south 20 feet of lot 12 were conveyed to James S. Park May 6, 1907, the conditions in the deed being:

"(1) No building other than one single tenement dwelling house and buildings appertaining thereto shall be erected upon said premises, and no bay window, porch, or other structure shall be erected or placed within 30 feet of Vinewood avenue.

"(2) No single tenement dwelling house shall be erected or placed on said premises costing less than $2,000."

South 20 feet of lot 13 and north 15 feet of lot 12 went to James A. Ballard and wife March 29, 1906, upon condition:

"Provided, however, that said premises are to be used for residence purposes only, and no house costing less than $2,000 shall be erected thereon, and no buildings shall be erected nearer than 30 feet to the easterly line of Vinewood avenue."

Edward L. Holmes and wife, March 29, 1906, acquired the north 15 feet of lot 13 and south 20 feet of lot 14; condition being:

"Said premises are to be used for residence purposes only. No house costing less than $2,000 shall be erected thereon, nor be erected within 30 feet of the easterly line of Vinewood avenue."

Lot 15 and north 15 feet of lot 14 was deeded to William J. Hartwig December 9, 1907; the deed containing no restrictions or conditions. Frank W. Snyder and wife, March 22, 1906, acquired lot 16 upon condition:

"No building other than one single tenement dwelling house and buildings appertaining thereto shall be erected upon said premises, and no bay window, porch, or other structure shall be erected or placed within 30 feet of Vinewood avenue. No single tenement dwelling house shall be built or placed on said premises costing less than $2,000."

And on October 2, 1908, lot 17 was conveyed to Goodenow and Girr, without condition, and lot 18, June 7, 1906, to August C. Schultz and wife, the deed containing same condition as in the deed to Snyder. Some of the grantees in these deeds conveyed the land by deeds containing no conditions. Kales, Mercier, Seidel, and Holmes all of them conveyed by deed containing no condition.

Lot 2 was deeded by the Hubbard Land Company to Joseph Boyer, and lot 3 to Lafayette D. Vorce and wife; the deeds containing substantially the condition in the deed to Henry G. Hubbard. These lots were acquired by Henry M. Leland in 1911 from Boyer and Vorce, respectively, and he, by deed of gift, trans-

ferred the property to Grace Hospital July 7, 1913. Boyer's deed to Leland and Leland's to the defendant provide that the land shall be subject to conditions set forth in the deeds to them, but waive the same so far as they have power so to do. The family residence of Bela Hubbard stands on what is now lot 2, and was erected before any restrictions as to use were attempted.

Lot 3 is, and has been, vacant unoccupied property. Mr. Reed, who contracted to purchase all of the land, who platted it, proposed to establish in the residence on lot 2 a school for stammerers. Public notice of this purpose was given, a sign was placed on the building, and about June 1, 1906, a substantial addition to the building was begun. He proposed to erect on lot 3 a dormitory to be used in connection with the school. Mr. Reed died in October, 1906. The building was never used for a school, and stood vacant until the month of August, 1909, when some one equipped it for a Swedish massage institute, and it was opened as such November 15, 1909. The addition to the building begun by Reed was completed. During the period from November 15, 1909, to December 25, 1910, the place was operated as a cure, containing as many as 27 patients at one time; some patients remaining as long as three months. Then, and until October 1, 1913, a rooming house was conducted there—for invalids. After October 1, 1913, various changes were made, and the hospital was formally opened January 1, 1914. Early in 1914 work was begun upon an addition to the building, to be used as a surgical room, which was completed in November of that year. The building of a nurses' home on lot 3 was projected, but not begun. In March, 1916, a written protest was made by owners of adjoining property, received, and referred to the defendant's board of trustees. Defendant expended about $5,600 for alterations of the building.

It proposes to erect on some portion of the premises, lot 2 or lot 3, a nurses' home to accommodate 20 to 22 nurses, to be used only for a home.

On the 16 lots, other than 2 and 3, there have been erected seven single residences and five designed for use of more than one family. Of the five, two are upon lots deeded without condition, and three upon lots restricted to a single tenement dwelling.

Eighteen persons, who are described as owning lots 1, 4, 5, 6, 7, 9, 10, 11, 12, 13, 16, 17 and 18 of the subdivision, join as plaintiffs in a bill of complaint, which was filed June 12, 1916, in which they charge that the defendant has begun to use the residence on lot 2 for hospital purposes, and is maintaining there a general hospital for the care of sick and injured people, with surgical department and operating room, and is proposing to extend the said hospital so maintained on said premises by the alteration and removal of the old building and by the erection of a large new hospital building, and that it is further proposed to extend said building upon the vacant lot 3, and intends—

"to commence the construction of a nurse home, so-called, upon a portion of said premises, all of which said present use and such proposed extension are contrary to the restrictions upon said premises as herein-before set forth."

It is prayed that preliminary injunctions, to be later made permanent, may issue to restrain defendant from erecting on lot 3 any building which does not correspond with the conditions referred to, and from carrying on and maintaining on said lot a nurses' home or hospital, and that as to lot 2 it be restrained from using it for any other than residence purposes, and from maintaining or conducting and carrying on any hospital, dispensary, or surgical department on said lot.

Defendant answered, there has been a hearing, and

a decree has been entered dismissing the bill. In an opinion delivered by the learned trial judge, he says, among other things:

"As far as I can find from the testimony, the purchase of all the other property by plaintiffs or others in this subdivision was made after the property on lot 2 had been diverted from residence to business purposes. Under all these circumstances, I cannot believe that the plaintiffs can insist on the preservation of a restriction that has never been operative upon this property. The only other question as to lot 2 involves the use of the property for hospital purposes and a claimed nuisance arising therefrom. I cannot find from the testimony that such exists. The use of the property is hardly different than it has been for some years, and to hold in accordance with plaintiffs' claim would be to declare a hospital a nuisance *per se.* That I am not prepared to do. A different question is involved in the consideration of the erection of the proposed nurses' home on lot 3. This lot has never been diverted to business use, and there is a restriction upon it. I cannot conceive, nor does the testimony disclose, that any serious detriment will come to any adjacent property by reason of this building. The question, however, resolves itself into the plain proposition: Would this proposed building be a violation of the restriction at present existing upon this lot? That the building is to be used for residence purposes is clearly shown and can hardly be in dispute. Does it comply with the term 'single dwelling house;' or, if not, has the strict construction of this part of the restriction been abandoned in this subdivision? The undisputed testimony shows that there has been erected without protest upon this subdivision buildings that do not strictly comply with the term 'single dwelling house,' and that, too, by some of the plaintiffs in this case. There is no doubt that the use of the lot must be confined solely to dwelling purposes, but I cannot find that the building, the nurses' home as contemplated, is any other than that purpose. I believe this case is greatly controlled by *James* v. *Irvine,* 141 Mich. 376 (104 N. W. 631)."

Upon the hearing in this court, on appeal, it was

distinctly stated that no relief was sought by plaintiffs upon the theory that defendant was maintaining a nuisance on lot 2—upon the theory that the hospital was, in and of itself, a nuisance in a residence district.

OSTRANDER, J. (*after stating the facts*). It requires no argument to prove that all of the property embraced in the Reed plat is in its use restricted to residence purposes. None is required, either, to prove that the use of the Bela Hubbard home, with or without additions thereto, for a hospital, violates the restriction, and is a breach of the condition. The Bela Hubbard house was a single residence when the partition of lands was made. No objection is perceived to including it in the general plan evidenced by the restrictive covenant since the partition. No owner of the title thereto has devoted it to any other use until defendant acquired it, and in fact any other use of it has been, until defendant bought it, temporary. Both its form and its use have been changed in violation of the restriction. It is equally clear, I think, that it will be a further violation of the restriction if the nurses' home is built on either lot 2 or lot 3.

The real question in this case is not whether a plain restriction has been and is proposed to be violated by defendant, the deed by which it acquired title and its use of the premises answering any suggestion to the contrary, but whether it can be brought to account therefor by adjoining proprietors, at some of whom the defendant points an accusing finger, asserting that "You did it first," or have otherwise lost the right to complain.

Defendant says the restrictions in the deed given by the heirs of Bela Hubbard to Henry G. Hubbard cannot be enforced by plaintiffs because, when a restrictive covenant is imposed for the benefit of the land still retained by the grantor, the restriction is not enforceable by subsequent purchasers *inter se*. As

applied to this case, this proposition rests upon the assertion that there is no evidence that the restriction in the deed to Henry G. Hubbard was inserted for the purpose of protecting or benefiting subsequent purchasers of the land. The evidence that the restriction was intended for the benefit of purchasers of the land is patent. The very character of the restriction is evidence of the fact, especially when the quantity of the land affected and its general location are considered. The presumption is that a restricted residence district was intended. Moreover, the contention is ruled against defendant by *Schadt* v. *Brill*, 173 Mich. 647 (139 N. W. 878, 45 L. R. A. [N. S.] 726) ; *Erichsen* v. *Tapert*, 172 Mich. 457 (138 N. W. 330) ; *Zoller* v. *Goldberg*, 183 Mich. 197 (149 N. W. 989).

It is next contended that restrictions in the deeds given by the Hubbard Land Company to purchasers of lots cannot be enforced by plaintiffs in this action. The argument is that (*a*) the evidence does not show any general plan of improvement maintained from its inception and understood and acted upon by all in interest; (*b*) the plaintiffs did not, in purchasing the property, rely upon the restrictions; (*c*) the restrictions were inserted for the benefit of lot 2, which was to be retained by Reed, who platted and sold the property. The cases of *Allen* v. *City of Detroit*, 167 Mich. 464 (133 N. W. 317, 36 L. R. A. [N. S.] 890), and *Summers* v. *Beeler*, 48 L. R. A. 54 (90 Md. 474, 45 Atl. 19, 78 Am. St. Rep. 446), are cited. It is quite reasonable to say that the deeds given by the Hubbard Land Company recognized the restrictions in the earlier deed, and that they were intended for the benefit of any purchaser of the land. If the earlier general restriction thus recognized is enforced, it is not important in this case to spend time in debating whether those laid by the Hubbard Land Company are precisely enforceable. As has been pointed out, there

is no occasion here to rely upon an advertised general plan and scheme of selling lots in order to find the intention to make a restricted district.

It is further contended, and is the contention of merit, that plaintiffs have acquiesced in a use of lot 2 for such a period of time that equity will not now grant them relief by injunction. In this connection, reliance is placed upon the fact that Reed expended money and made some changes in the residence building; Malmberg, in fitting it for a Swedish massage institute, expended a considerable sum of money; and defendant has at some expense made additional changes.

The case is not free from doubt; and while, perhaps, a doubt ought never to be resolved in favor of a covenantee who buys with purpose to breach his plain covenant, it remains that every one who, since the platting, has been lawfully in possession of lot 2, has used it visibly for other than residence purposes. The additions made to the building denote—advertise —the fact that a residence is not and will not be maintained there. Owners of adjoining property, and some of the plaintiffs who purchased from Reed, have been advised by the record and by their deeds of the restrictions sought now to be enforced. It is to be inferred that the building on lot 2 has physically lost its character as a residence, and only by expensive changes can the residence character thereof be restored. There is fair ground for refusing to plaintiffs the injunction so tardily asked for, and it will be refused as interfering with the use by defendant of lot 2.

It is held, and has been already stated, that the proposed nurses' home will not be a residence within the meaning of the condition, and plaintiffs may have the writ of injunction to restrain the erection of the building on lot 3.

Neither party will recover costs of this appeal as against the other, but one-half the cost of preparing and printing the record will be borne by plaintiffs and one-half by defendant.

KUHN, C. J., and STONE, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.