BARTOLOMÉ FIOL GOMILA, Plaintiff and Appellant, *v.* LEANDRO LÓPEZ DE LA ROSA ET AL., Defendants and Appellees; J. A. LÓPEZ ANTONGIORGI, Intervener and Appellee.

No. 6140. Argued December 14, 1933.—Decided May 29, 1934.

*H. Torres Solá* for appellant. *C. Iriarte* and *F. Fernández Cuyar* for defendants and appellees. *H. R. Francis* for intervener and appellee.

Mr. Justice Córdova Dávila delivered the opinion of the Court.

On July 1, 1930, Bartolomé Fiol y Gomila applied to the District Court of San Juan for a writ of injunction restraining Leandro López de la Rosa and Simón Axtmayer, personally and through their employees and subordinates, "forever from using for a clinic or for other non-residential purposes, the houses designated as Number 1 Olimpo Avenue and No. 4 Palma Street, which are now occupied by the Miramar Clinic of Leandro López de la Rosa."

It is alleged in the complaint that the plaintiff is the owner of house and lot No. 2 on Palma Street, Miramar, Santurce; that the defendant Axtmayer is the owner of house and lot No. 1 on Olimpo Street, Miramar, Santurce, which is bounded on the rear by the property of the plaintiff, and that the defendant López de la Rosa has established a clinic or hospital for the lucrative business of attending the sick, in the house of the defendant Axtmayer and in another house located on another lot which adjoins that of the plaintiff, designated as No. 4 Palma Street, which belongs to José A. López Antongiorgi. The said lots were sold originally by the "Asociación Popular Cooperativa de Construcciones, Ahorros y Préstamos," subject to the following restriction which was recorded in the registry of property.

"These lots shall not be used for mercantile or industrial establishments, but strictly for the erection of dwelling houses."

It is also alleged that notwithstanding the fact that the defendants knew of the said restriction, the defendant Leandro López de la Rosa, as the lessee of Simón Axtmayer and José A. López Antongiorgi, against the will of the plaintiff, has been using and still uses the building described for the

purpose of maintaining a paying hospital to lodge sick persons, and for other non-residential purposes. Lastly, it is alleged that the plaintiff, due to the installation of the said clinic or hospital in the said location, suffers serious and irreparable damage since he cannot rent his house because of the noise, bad odors, and other inconveniences inherent in the operation of a hospital, which constitute a nuisance and a hazard to the plaintiff.

López Antongiorgi, the owner of house and lot No. 4 on Palma Street, intervened in the suit, and the defendants and the intervener finally answered the complaint, denying certain allegations and alleging special defenses which may be summed up as follows: That the house of the plaintiff, while owned by him, was leased to Amelia Dávila de Mock, for the purpose of establishing there the Miramar Clinic, which continued to be located in said house for more than two years; that the defendant López de la Rosa acquired said clinic from Dr. Biascoechea in 1927 for the price of $20,000, and later expended large sums on it, in the belief that there existed no opposition on the part of anyone and least of all on the part of the plaintiff, as the said clinic had been operated publicly since it was established in 1914 by Mrs. Mock, and was installed in part, as has been said, in a house belonging to the plaintiff. During the trial of the case the plaintiff, with leave of the court, filed an amended complaint to conform the pleadings to the evidence. Two amendments were introduced: one stating that the intervener José López Antongiorgi is the owner of the house designated as No. 4 Palma Street which he has leased to the defendant Leandro López de la Rosa, and the other eliminating from the title the word "injunction" and substituting for it "performance of a restrictive covenant". In the prayer the words "writ of injunction" were also eliminated.

Judgment was rendered for the defendants. The plaintiff appealed, and he has assigned several errors which we shall

consider in so far as they affect the fundamental questions raised in this case.

There is no doubt as to the existence of the restriction invoked. Nor is there any doubt that this restriction should be enforced where the right of the plaintiff appears from the pleadings and the evidence. Two cases have already been decided by this Supreme Court dealing with lots in the same subdivision where the clinic and the lot of the plaintiff are located, to wit: *Glines et al.* v. *Matta et al.*, 19 P.R.R. 388, and *Macatee* v. *Biascoechea et al.*, 37 P.R.R. 1, 2.

In the first of the cited cases it was decided that an injunction will lie to prevent the violation of restrictions imposed upon the owners of lots segregated from a tract of land which has been urbanized and the whole of which is subject to the said restrictions. In the syllabus of the case it is stated that—

"Where a co-operative building association imposes certain restrictions regarding the construction of buildings upon land to be divided into building lots and such restrictions are set forth in the record of the deed to the whole tract in the registry of property and mentioned in subsequent deeds, all subsequent purchasers of lots are bound to respect them although no specific contract is made with respect to said restrictions in the conveyance to them.

"The owners of lots segregated from a tract of land which has been urbanized and the whole of which is subject to certain building restrictions which appear in the record of the property in the registry of property, may sue for an injunction to restrain other owners of such lots from violating said restrictions."

In *Macatee* v. *Biascoechea, supra,* this court held that: "A covenant restricting the building on certain land to residential purposes is violated when a building erected thereon is used as a hospital."

The appellant in his brief maintains that the restriction in question constitutes a negative servitude as the term is defined in section 540 of the Civil Code, and relies on the opinions of the Supreme Court in the *Glines* case, *supra,* and

in *Lawton* v. *Rodríguez*, 35 P.R.R. 445. In the first of these cases the court expressed itself as follows:

"What complainants are really alleging is an infraction of their rights by reason of their possession of a piece of real estate. They are maintaining their right, if not clearly to an easement or servitude to something akin thereto. They are maintaining a right to have three meters of space free of structures in the part ·of Miramar where they are located. They are maintaining an interest in land we think within the letter and spirit of section 75, and if one of their main contentions be sound that interest followed the land rather than the person. Such was the issue between the parties and respondents had the right to have the issue tried in San Juan."

In *Lawton* v. *Rodríguez, supra,* this court said:

"The most important contention of the appellant against the judgment sustaining the complaint is that the restriction is of a personal nature between the vendor and the vendee which does not bind future purchasers among themselves, and that such a restriction is not the servitude recognized by the Civil Code for which there must always be a dominant and a servient tenement.

"In our opinion, in adopting the old Civil Code in the matter of servitudes without introducing any change or innovation therein the Legislature was not actuated by the fact that it could not foresee the new method represented by the restrictions whose character is discussed and which exigencies or more modern improvements seem to impose by reason of sanitary requirements and for embellishment or beautifying purposes, but because the meaning of the positive and negative servitudes defined by the Code is so broad that when such restrictions are analyzed they do not seem to be different in their nature from the negative servitudes defined by the Code in its section 540, as follows:

" 'Servitudes are also positive or negative.

" 'A positive servitude is one which imposes upon the owner of the servient tenement the obligation of allowing something to be done or of doing it himself, and a negative servitude is one which prohibits the owner of the servient tenement doing something which would be licit for him to do if the servitude did not exist.'

"Within legal technicality, if the servitude consists in allowing something to be done by the owner of the servient tenement (positive servitude), or in forbidding him to do something which would be licit if the servitude did not exist (negative servitude), it would

seem logical that the restrictions that bind reciprocally each owner of a lot to build only one house on each lot, partake essentially, because of the prohibition of a specific use of the property of another, of those servitudes that consist in not to construct a higher building, *servitus altius non tollendi,* which, coming from the Roman law, had been well known up to the present.''

We believe that something resembling a servitude is indeed involved, but the truth is that this something, while deeply rooted in historical law, appeared for the first time in all of its integrity, and as presented in this case, upon the introduction in this island of the so-called subdivisions (*urbanizaciones*), wherein large and small parcels of land are used, in whole or in part, for building-sites, streets, side-walks, sewerage, water, and lighting systems, according to rules previously established. Such rules should therefore be interpreted in accordance with the principles of law in the light of which they have been construed in the states of their origin, provided, of course, these principles are not in conflict with the laws in force in Puerto Rico.

In the very cases cited by the appellant, the court said, in the first case through Mr. Justice Wolf, that something *equivalent to an encumbrance or a servitude* was involved, and in the second case through Mr. Justice Franco, that there was involved something which *partook in its essence of the nature of certain servitudes,* but in the decision of both cases principles of equity were applied, in accordance with the decisions of American courts on the point.

From the Enciclopedia Angloamericana, vol. 5, pp. 4 and 5, we copy the following:

''The rights created by restrictive clauses and covenants are frequently designated as easements; and although the manner in which those rights are constituted and the limits within which courts of equity recognize them differ from ordinary easements, however, the fact that the courts should enforce them in a negative way and require, in order to connect them with the realty, that they be imposed for the benefit of other adjacent lands, demanding in short the existence of a dominant and a servient tenement, renders them

very analogous to real easements. It has been denied, however, that those rights may satisfactorily be considered as easements and equity courts generally refer to them as negative or equitable easements, or simply as equities or acquiescences.''

The plaintiff eliminated the word ''injunction'' from the title of the prayer of the complaint. Although a change of title does not alter the nature of a cause of action, the truth is that in the original complaint as well as in the amended complaint, the performance of a restrictive covenant is demanded, and it is precisely such restrictions which, in accordance with the American cases, are governed by the principles of equity.

The evidence shows that the Miramar Clinic has been operated publicly and openly from the time it was established, and that the defendant, López de la Rosa, after this clinic had been established and had functioned without interruption for some ten years, acquired the same, investing a considerable sum of money. Plaintiff's knowledge of the existence of this clinic is something which admits no doubt.

Let us examine now the evidence presented in so far as it concerns the conduct of the plaintiff himself, in order to see whether or not he is entitled to the relief sought.

The plaintiff begins his testimony by stating that as soon as he began to build a year ago he realized that he could not build a four-story house there with the clinic alongside and since the clinic was illegal, he decided to apply for an injunction. With the clinic alongside it would be somewhat difficult for him to rent the house. The clinic did not prejudice him formerly because his house was occupied by the ''Elks'', but when he began to construct his building he noted that the clinic was a great detriment. The plaintiff speaks then of the bad odors of the medicines and the meals, of the cotton thrown into the yard, of the clothing and moans of the patients, and of the removal of corpses. For these reasons the clinic made it difficult to rent the house.

Thus the plaintiff begins his testimony. From his statements it is inferred that, despite the fact that the violation of the restrictive covenant dated from many years, he had taken no step to avoid a continuation of the violation because up to the time he began construction on his building it had not prejudiced him. It is well to note that the action brought is not based on a public or private nuisance which the plaintiff seeks to abate, but on a contractual obligation originally imposed when the lots were sold by the Asociación Popular Cooperativa de Construcciones, Ahorros y Préstamos. We say this merely for the purpose of maintaining the purity of the proceeding, because the truth is that the evidence adduced does not show that the operation of the hospital at present constitutes a nuisance.

The witness states that in 1913 he removed to Santo Domingo. When he was first asked how many times he had come to Puerto Rico since that time, he answered that he came once during the seven years that he was there. He repeats this statement, saying that from 1913 when he left, until 1920 or 1921, up to which time he was in Santo Domingo, he only came once. The witness states that the first time that he came to Puerto Rico, Cipriano Santos, who was in charge of the house, told him that he had rented it to Dr. López Antongiorgi, and later he says that Cipriano did not speak to him of Dr. López Antongiorgi, that he told him that he had rented the house to a doctor for a clinic and that the witness informed him that he could not rent it for a clinic, and Cipriano answered "I rented it." This happened, according to the witness himself, in 1915 or 1916, and he again states that he came over from Santo Domingo only once. Further on he testifies that Cipriano told him that he had rented the house to a doctor, without telling him that it was for a clinic, and that he saw the clinic afterwards. The defendant reminds him of what he had testified a moment before and he then states that Cipriano told him that he had rented the house for a clinic, and that the witness answered him that

he could no rent it for a clinic. The plaintiff made these statements when he was first called to the stand while his evidence was being presented. Later we shall refer to his testimony given when he was re-called in order to rebut the evidence of the defendant.

Mrs. Amelia Dávila de Mock, who established the Miramar Clinic in 1914, leasing the house from Mr. Fiol, testified that she spoke of the house at first to Don Bartolomé Fiol and told him that she was interested in it; that afterwards she dealt with Mr. Fiol's attorney in fact, named Don Cipriano, whom she told that she needed the house for a clinic. The witness stated that she only asked Fiol if he would rent the house to her, and that she dealt with Cipriano Santos with respect to the lease; that after the clinic was established she saw Mr. Fiol many times and remembers having spoken to him there about fixing the cess pools under the house, and on several other occasions; that Mr. Fiol was married and that she saw his wife one day when he took her to the clinic for treatment of a skin eruption; that Mr. Fiol accompanied his wife when she went to the clinic; that she spoke with Mr. Fiol the year that she leased the house, in 1914, and that when she spoke to him he was in Puerto Rico; that Mr. Fiol went away frequently; that many times she asked Don Cipriano who told her that he was in Santo Domingo; that she paid the rent of the house to Don Cipriano.

Dr. López Antongiorgi stated that in or about 1914 the Miramar Clinic was installed in a house which was the property of the Fiol spouses; that this clinic belonged to Mrs. Mock for the first two years and afterwards to the witness, who bought it when he built a house beside it; that the house of Mr. Fiol and his house constituted the Miramar Clinic, and were joined by a bridge upstairs and downstairs; that when Mrs. Mock delivered the clinic to him he spoke to Mr. Fiol and agreed upon a price somewhat higher than that paid by Mrs. Mock in order to continue in the house, and that Mr. Fiol also agreed to the bridge and that for two or

three years he used the house, connected with his building for the Miramar Clinic; that the bridge was a prolongation of Mr. Fiol's house up to the porch of the house of the witness, and connected the two; that both houses constituted the Miramar Clinic; that he continued under these conditions until 1916 or 1917, and that during this time he dealt with Mr. Fiol with respect to the rent; that on another occasion when the floor of one of the large rooms of the house was sinking, the witness, who was then a member of the Board of Health, called an inspector who told him that the house was in a dangerous condition and that it should be repaired; that for this reason he communicated with Mr. Fiol who came that same morning and repaired the floor.

The witness Vicente del Valle stated that he saw Mr. Fiol several times in the clinic about the years 1915 and 1916; that Fiol resided in Santo Domingo and came to Puerto Rico; that he does not know how many times he came, but that he saw him on the premises several times.

Dr. Manuel Díaz García also testified that he remembers having seen Mr. Fiol in the Miramar Clinic about the year 1916.

The evidence of the defendant tends to show that Mr. Fiol had knowledge of the establishment of the clinic in his own house, which was leased by his attorney in fact, Cipriano Santos. In order to rebut this evidence, the plaintiff again took the stand.

He testified that he moved to Santo Domingo to establish a mosaic factory which operated until 1922, when he returned to Puerto Rico; that from Santo Domingo he went directly to Spain, where he courted and married Corona Cortés, that the marriage contract (*capitulaciones matrimoniales*) was executed there on June 13, 1914, three days prior to the celebration of his marriage in Barcelona; that after his marriage he lived in Spain for four months and sailed from there for Santo Domingo, where he arrived 30 days later; that the ship touched at Cádiz, Valencia, and Puerto Rico; that in

the year 1916 he came to Puerto Rico on a schooner and later returned in 1920; that his wife lived in Spain for two years, in Puerto Rico for two years, and the rest of the time in Santo Domingo; that the witness returned from Santo Domingo in 1922; and that his wife died here, in San Juan, in 1923; that before July 15, 1914, when the house then standing on the lot of the plaintiff was leased to Mrs. Mock, he was in Santo Domingo; that he had heard Mrs. Mock testify that he had been present at a certain meeting in that house which was rented, and that on that date he was in Santo Domingo; that he does not know Mrs. Mock or Doctors López Antongiorgi and Díaz García; that he does not know Dr. Díaz García; that he has done no business with him; that he knows him now because he has bought mosaics from him. Cross-examined by the attorney for the defendant, he answered that he left Santo Domingo for Spain in 1914, about February 25; that he returned alone to Santo Domingo and that his wife remained in Spain until two years later; that he remained in Santo Domingo until 1916 when he came to Puerto Rico on a schooner; that he was in Puerto Rico before his wife returned that same year and that he did not come to see her when she returned; that his wife moved to Santo Domingo where she remained two years and later returned to San Juan and lived in one of his houses on Américo Salas Street; that he did not see his wife for four years; that he came to Puerto Rico in 1920 and stayed here two days; that he has been here since 1922 and has not gone to Santo Domingo or Spain.

Before the testimony of the witness had been closed the court took a recess until the following day. When the trial was resumed the attorney for the plaintiff stated that in view of the defendant's motion requesting the summoning of an employee of the Immigration Bureau with certain documents, the plaintiff, searching his memory, had remembered other trips and wished to amplify his direct examination before being cross-examined as to all of the time he was absent from

Puerto Rico. The witness was asked if in addition to his trip to Spain when he was married he made another trip with his wife and answered that yesterday he did not remember, because he does not know how to read or write, that he scarcely knows how to sign his name, that he remembered last night that he left San Juan with his wife for Spain and that they both executed a public deed before a notary in Mahon, Menorca, on February 22, 1916, and that on their return they sailed from Barcelona and landed in Puerto Rico; that he remembers having made a trip with his wife to Santiago de Cuba, sailing from Puerto Rico, to which they returned with a musical comedy company called the Corona Company; that his wife came from Santo Domingo to the Auxilio Mutuo about 1919 or 1920; and that he came to see her once while she was in the said hospital; that he keeps no record of his travels and that he is uneducated.

To the questions of the attorney for the defendant he replied that he thought that he made a trip to Puerto Rico in 1914 on the ship Legazpi; that he thought that he stopped off in Puerto Rico when he came from Barcelona to Santo Domingo; that in the year 1916 he came to Puerto Rico; that he made two trips to Puerto Rico in 1916, one on the steamer "Jacaguas" and another on a schooner; that he came to Puerto Rico from Barcelona in 1916 on the steamer "Buenos Aires" and that he made three trips that year; that he also came here in 1919 and in 1920.

It is very difficult to follow the witness in his testimony, which, aside from being extensive, is confused and redundant, because the questions and answers are repeated, and the plaintiff denies what he previously admitted or admits what he had denied, contradicting himself frequently. Under the pressure of cross-examination, Mr. Fiol admitted that he made several trips to Puerto Rico, although when he first testified, he stated on repeated occasions that between 1913 and 1920 he came to this island only once.

Mr. A. R. Bennett, Assistant Commissioner of Immigration of Puerto Rico, made a report of the travels of Fiol to and from Puerto Rico. This witness stated that on July 29, 1914, Mr. Fiol arrived at San Juan on the S. S. "Legazpi" from Barcelona; that on September 19, 1915, he landed at this port on the S. S. "Cuba" from Havana; that on January 17, 1916, he reached San Juan on the S.S. "Jacaguas" from the Dominican Republic; that on April 29 of the same year he arrived at this port on the S. S. "Buenos Aires" from Barcelona, Spain; that on January 29, 1919, he arrived in San Juan from Santo Domingo on the S. S. "Santo Domingo"; that in April 1920, he came into San Juan on the S. S. "Marina" from Santo Domingo; that on November 9 of the same year and on the same steamship he also landed at this port from Santo Domingo, and that on February 10, 1922, he arrived at San Juan on the S. S. "Marina" from the same republic.

On November 23, 1914, Mr. Fiol in his own behalf and as attorney in fact of his wife, Raimunda Andrés Miguel, then living in Spain, executed a deed in San Juan before Notary Francisco Ramírez de Arellano. Mr. Fiol again took the stand and stated that he came to Puerto Rico once with that lady and, as she could not land, he said that she was his wife; that he did not have to take an oath and did not sign any document; that he stated before Mr. Monserrat that she was his wife in order not to offend her after she had said to everyone that he was her husband. According to the recitals of the deed, at the time Bartolomé Fiol stated before a notary that this woman was his wife in order not to offend her, she was residing in Spain.

The evidence shows that Mr. Fiol left Puerto Rico and returned quite frequently. Between 1913 and 1920 the plaintiff was in Puerto Rico seven times, besides his last trip in 1922 to reside permanently on the Island. The witnesses who testified to having seen him in the clinic on several occasions could well have seen him there; but, even discarding the tes-

timony of these witnesses, it is difficult to believe that this man who had his house rented, should not trouble to ascertain to whom it was rented and for what purpose. The plaintiff himself states that the first time he came to Puerto Rico Cipriano Santos told him that he had rented it to a doctor for a clinic, and it has been proved that from 1914 on, the trips back and forth of said plaintiff were frequent. Did Mr. Fiol take any step to obtain fuller information, assuming that it was necessary, and to prevent that his house continue to be used as a clinic? It does not appear that the plaintiff took any step in this direction. The house was subsequently leased to other persons. The clinic continued to operate and Mr. Fiol, who had knowledge of its existence, passively allowed the time to pass until 1930 when he brought this action, sixteen years after the said clinic had been established.

In accordance with the principles of equity, a court should give no ear to one who asks to be relieved from the consequences of his own negligence or that of his agents. *Miller* v. *Barto,* 247 Ill. 104, 93 N. E. 140; 21 Corpus Juris 251. It is a principle firmly established by the courts that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were of such nature as to put upon a person of ordinary intelligence the duty of inquiry. *Johnston* v. *Standard Mining Co.,* 148 U. S. 360, 370.

The defense of want of knowledge on the part of a person charged with laches is easy to prove and hard to disprove, and hence the tendency of the courts to demand reasonable diligence in acquiring the proper information. *Foster* v. *Mansfield, etc., Railroad,* 146 U. S. 88.

It must be borne in mind that the plaintiff admits having lived here constantly since 1922. Between that date and 1930 eight years have elapsed, and it has not been shown that Mr. Fiol had taken any step, or made any effort, or called the

attention of the defendants, in order to prevent the latter from continuing to violate the restriction.

In the case of *Loud* v. *Pendergast,* 92 N. E. 41, suit was brought to restrain the violation of a building restriction, imposed as a general scheme for the common interest, requiring all buildings to be set back from the street line at least ten feet. A small part of the defendant's house was within the restricted area. The plaintiff had also violated the restriction by causing her building to encroach a few inches upon the restricted area, and by erecting bay windows which projected into it over 3 feet. The Supreme Court of Massachusetts in deciding this case on appeal expressed itself thus:

"It is urged that the plaintiff is not entitled to relief because she has been guilty of laches, because she has herself violated the same restrictions in such a way that she comes into court with unclean hands, and because the original scheme has been so generally violated in the neighborhood as to make it unconscionable to enforce the restriction against this defendant.

"Relief in equity in cases of this nature is granted only when sought with promptness, and where active diligence has been exercised throughout respecting the matter of complaint. Conscience requires that one should not stand by in silence, while another makes considerable expenditures in good faith under an assumed right, and then ask a court to enforce compliance with the restrictions at great loss, when seasonable notice or other appropriate action might have prevented the wrong complained of. *Stewart* v. *Finkelstone,* 92 N. E. 37, and cases cited.

"Where a plaintiff has violated the very restriction he seeks to enforce to substantially the same extent and in the same general way as has the defendant, and there is no material difference in kind or degree between them, a court of equity will not ordinarily interfere. *Bacon* v. *Sandberg,* 179 Mass. 396, 60 N. E. 936; *Scollard* v. *Normile,* 181 Mass. 412, 63 N. E. 941. Such a plaintiff is not in a position justly to complain, for he does not come into court with clean hands respecting the precise subject as to which he invokes relief, nor has he complied with the maxim that he who seeks equity must do equity."

From High on Injunctions, paragraph 1159, we copy the following:

"In considering applications for relief by injunction against the breach of restrictive covenants contained in conveyances of real property, the courts require due diligence upon the part of the plaintiff seeking the relief, and laches or acquiescence on his part in the violation of the restrictive covenant will ordinarily defeat his application. Indeed, equity requires the utmost diligence, in this class of cases, upon the part of him who invokes its preventive aid, and a slight degree of acquiescence is sufficient to defeat the application, since every relaxation which plaintiff permits in allowing erections to be made in violation of the covenant amounts, *pro tanto,* to a disaffirmance of the obligation. Where, therefore, plaintiff lies by for a period of four or five months, permitting defendants to go on with their erections in disregard of the covenant, he will be denied relief by injunction."

This court in the case of *Macatee* v. *Biascoechea, supra,* mentioned the case of *Hartwig* v. *Grace Hospital,* 198 Mich. 725, 165 N. W. 827, cited in a note to 32 C. J. 211 (note 25 a), wherein it is said:

"And owners in a district restricted to dwellings, who stand by and allow a dwelling to be altered at different times, at large expenditures of money, out of all semblance to a dwelling and used as a hospital, will not be granted an injunction to restrain its maintenance as such, although an injunction will be granted to restrain additional buildings."

With regard to the "noise, bad odors, and other inconveniences inherent in the operation of a hospital, which constitute a nuisance and a hazard to the plaintiff," as he alleges in his complaint, there was the testimony of the plaintiff himself in support of his allegations, of Dr. López de la Rosa denying them, and of Mr. A. G. Bishop, Secretary-Treasurer of the Union Club, who had lived next to the Miramar Clinic for a year at the time of his testimony. The last-named witness testified that while he has been at home he has not been disturbed during the night or day by the Miramar Clinic; that he has not been annoyed by bad odors; that

he is at the club six, eight, or ten hours during the day, and that during the twelve years that he has been there he has not been bothered by the said clinic; that between the Union Club and the Miramar Clinic there is a triangular panel of land; that in front there is a distance of between three and four meters, and the distance increases toward the rear; that at the widest part the clinic and the club are separated by the width of a lot on which a house under construction by Mr. Fiol is located.

Even though the action brought is for the performance of a restrictive covenant, the truth is that the nuisance alleged by the plaintiff has not been proved, unless we were to reach the conclusion that a hospital is a nuisance *per se*.

As to the award of costs, we feel that in view of the evidence taken and of the conduct observed on the part of the plaintiff, the discretion of the lower court has been properly exercised and the judgment appealed from should be affirmed in its entirety.

Mr. Chief Justice Del Toro took no part in the decision of this case.